IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| * * * * * * * * * * * * | * CRIMINAL ACTION |
| USA | * NO. 04-61 |
| | * |
| VS. | * JANUARY 21, 2005 |
| | * |
| JOSE CASTRO | * PROVIDENCE, RI. |
| * * * * * * * * * * * * | * |

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH

DISTRICT JUDGE

(SENTENCING)

<u>APPEARANCES</u>:

FOR THE GOVERNMENT: MARY ROGERS, ATTY.
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

FOR THE DEFENDANT: JOHN M. CICILLINE, ESQ.
Cicilline Law Offices
387 Atwells Avenue
Providence, RI

Court Reporter: Anne M. Clayton, RPR
One Exchange Terrace
Providence, RI 02903

Exhibit-D

THE COURT: Okay. Let me hear from the defendant on this.

MR. CICILLINE: Respectfully, I think the Court has honed this case right down to where it needs to be honed.

This is a case where but for the career criminal section of the guidelines this defendant would be facing in the area of 120 to 125 months based on his criminal history. Those numbers are in line with the statutory penalties that we have in this case of a minimum of ten years. I would ask this Court to use that as the guide to where you can impose a sentence that will meet the ends of justice, that will do as you just described, sentence that is sufficient but not greater than necessary.

I think one of the ways you could do it, and I think if I understood the Court correctly, you're looking for a reason, if it's out there, to give sort of a departure.

And in this case, I think the way you can do that, respectfully, is to look at the criminal history of the defendant and really what it stands for.

Basically, when he's 19 years old he has

some driving offenses. He gets caught with two pounds of marijuana, spends a day in jail and is released on a suspended sentence. Thereafter, he gets picked up in Rhode Island. I guess that was just a couple of years later. Gets picked up with an ounce of marijuana. He's given two years suspended sentence with a program to try to straighten himself out.

Thereafter, shortly thereafter, he gets picked up in Rhode Island with three pounds of marijuana. And as a result of that it's the first time that he really spends some time in jail. He does 90 days as a violator. They put him on a long suspended sentence.

While he's out on that suspended sentence, he gets in trouble for having a bill in which -- strike that, Judge. He gets arrested in Massachusetts for possession of 22 grams of heroin that he's selling. While he's out on bail, he picks up on another charge of possession of a dollar bill that had residue on it.

And then ultimately, he ends up in this Court based on his new arrest of the two kilograms of cocaine.

So basically, Judge, he's got two pounds

of marijuana. He's got an ounce of marijuana, three pounds of marijuana, for which he does 90 days. So we're talking about five pounds of marijuana and 22 grams of heroin. And based on all that, he's only served three years and 90 days in custody.

And it seems to me that as the Court points out the jump, because of his career criminal status, that more than doubles a sentence that the guidelines could apply if it were not for the career criminal and the statutory situation of up to ten years, I think the Court can say he's only been to jail twice, 90 days in three years. And what sort of a sentence do I need to impose to give Jose Castro a chance to get it.

And I know a lot of people come before this Court and facing big sentences. They do stand here and say, "Judge, I've gotten it."

Mr. Castro needs the opportunity, and I don't know if the Court wants me to go into his background now or do it later, but what he needs is the opportunity to go into custody, to go into a federal prison to deal with the problems later on in his life.

Can that be accomplished in a ten-year

period? I certainly think so, because he's never had the benefit of a federal prison, which provides him the opportunity to have some skills, to learn new things.

Certainly, it would be a far greater sentence than he has ever served before. And it seems to me that if we put Mr. Castro in that position, you protect the public. You give him the chance that he needs to rehabilitate himself. You give him an opportunity to get an education. Yes, you have to look at his criminal history, but I do not believe, respectfully, that his criminal history is that bad for what he's done.

And Judge, I guess I need to touch on where Jose Castro comes from. This is a young man who started off life when he came to Rhode Island when he was nine years old. His mother and father were never married. After he moved from New York to Rhode Island, he lived with his father. Father was a very strict man, kept Jose in school. Jose did the chores, did the housework, wasn't doing I guess what typical kids were doing of his age.

As time went on, you know, there was some issues about, you know, maybe neglect with the mother, and now he's here in Rhode Island with a

very strict father. Probably a good figure to have in his life to keep him under control.

I think when he looks back on it now, he realizes that his father was trying to do the right thing with him, but at a young age it's difficult to really understand that.

At age 16, the father threw him out of the house. And when he was thrown out of the house, he was thrown to the streets, and he did what we all do, we survive. And he went on the streets and, you know, got involved in things that he shouldn't have. He had a cousin who was involved in some drug activity and allowed him to make some money. That was sort of his way to get by.

Then it all fell apart, Judge. He lost everything. He lost a place to stay. He lost money. And he was basically living in his car for a short period of time. And then when he had car problems, he actually lived on the streets. And we discussed that last night at the prison. He said, "I never told anybody that, but I actually lived on the streets." It was only two days, Judge. I said, "What time of year was that?" He said, "It was summer." But he had hit bottom.

And what he did was he picked himself up,

he called his mother. And he was a proud kid. He didn't want anybody's help. He wanted to do it on his own. I can only think that that all comes from the way he was brought up. And he called his mother and he said, "Come to Rhode Island. I'll help you live, and we'll get a place." And the mother did come a week later. Came with his brother and his sister. And they became a family again, and Jose was happy. Things were going good for him.

And then things started to get bad around here, and he eventually left and went to New York. And unfortunately, when he went to New York, he met what they commonly refer to on the streets as a connect. That was someone who could provide him with an opportunity to get drugs and make some money.

Unfortunately, he came back here and he was dragged back into the life on the streets, making money to survive. And that's unfortunately what he did. He spent 90 days in jail, which was fairly simple I guess for him. He spent three years in jail for the problem up in Massachusetts.

And I actually drove him to prison that day, and we became pretty friendly. And you know,

we talked about, you know, you got to take advantage of this situation. And he toughed it out. It was three years and a day. And that's because in Massachusetts that day makes you do the whole three years. And he did that, and he got out, and he was on the straight and narrow. And then he fell back into it.

He was trying to gather enough money to get out of here, move away with his family. He's got two young kids. He's got a four-year-old and an eight-year-old. He's got a woman who has been in his life for some 16 years, and she's still by his side. But I think he now gets it.

And, Judge, I see this a lot. You see the youngsters who get in trouble and than they sort of grow up and they say, "You know what? I'm not that same young kid running the around the streets crazy. I can't go to jail now. I have responsibility. I have kids."

I certainly think when you look at the facts of this case, yes, they're bad. Yes, he shouldn't have had two kilograms of cocaine and marijuana, but the bottom line is he's gotten it. And not only does he have it today, he's got another bunch of years to go to think about that

each and every day about what he's done with his life.

He's basically a good person. I think he'll thrive in the prison system. I think he'll excel and do what he has to do, again, to survive. And I think he'll come out of prison with a new perspective on life, and I think that can be accomplished at something far less than the 22 years that the guidelines calls for. And I'm asking this Court to consider that and give Jose Castro a chance to prove that he could do it. I might add, Judge, that he was a worker. It wasn't that he didn't have a job. He was working, and he ultimately wants to come out and go back to work and support his family.

So we're asking that the Court consider using the guidelines as that, a guide, but also look to the statutory numbers and also look to what the numbers come out if he were not a career criminal. And I think it all points to that 120-year mark, and he would look to that range. Thank you.

THE COURT: Okay. Thank you, Mr. Cicilline. Does Mr. Castro wish to say anything?

THE DEFENDANT: I'm kind of nervous, your Honor. I wanted to read this thing that I put together last night.

I'm here today, your Honor, to plead myself to you with the hope of convincing you, your Honor, to a lesser sentence as possible. I understand I made mistakes choosing this role. I had a lapse in judgment and that I hurt a lot of people who -- excuse me.

THE COURT: Take your time. Relax.

THE DEFENDANT: I'm nervous. I'm sorry.

THE COURT: It's all right.

THE DEFENDANT: I hurt a lot of people, especially my common-law wife, Marielle. We've been together 16 years. Also our two children Davonte and Naja, eight years old. I would like to know -- I mean, I would like you to know that I am a good father and one hundred percent involved in their life.

Your Honor, I am a good person and given a chance with minimum time that could be handed down to me from you would take this chance, your Honor, and be a positive role model to our children. With the support of my family, stay on the straight, honest providing role, I will utilize

all the tools that are given to me. I understand I cannot make up for lost time, but I will definitely work hard on my and our future. Thank you for giving me this moment, your Honor.

THE COURT: Okay. Thank you, Mr. Castro.

Ms. Rogers, do you have your guideline manual with you?

MS. ROGERS: Yes, your Honor.

THE COURT: Would you take a look at 4A1.3(b)3.

Is that new with 2003, do you know? I don't recall that from previous --

MS. ROGERS: My guideline books are effective November 5th, 2003. It's in that one. I don't have the pre-2003 guideline book.

THE COURT: Well, in any event, okay, I'm now going to impose sentence, Mr. Castro. Could you please rise.

As I indicated in some of my comments earlier, my intent is to evaluate every case first with reference to the guideline range, and then if I believe a lower sentence is appropriate, to give my reasons why that's a reasonable sentence and to evaluate it through the prism, if you will, of the departure structure contained in the guidelines.

is a reasonable sentence. And under Booker and Fanfan, I believe that is permitted. And the reasons I believe it is permissible are the reasons that I have attempted to explain here today, that is, that I believe that the criminal history or the effect of the career offender provisions is so severe that it exaggerates this defendant's criminal history beyond what is actually represented.

He has some significant prior convictions, but they are not of such a severity, in my view, that they merit rising to the level of a 262-month sentence. And so I believe the 262-month sentence over-represents his actual criminal history. And so I believe the sentence I've imposed is reasonable for all of those reasons.

All right. Is there anything further? Did the defendant waive his appeal rights in the plea agreement?

MS. ROGERS: The Government would not hold the defendant to that. I believe he waived partial and didn't waive the collateral 2255 ineffective assistance, that type of thing. I believe we hand-wrote in the changes because --

THE COURT: All right.

MS. ROGERS: But the Government would not hold him to that portion of the agreement.

THE COURT: All right. Then Mr. Castro, given what Ms. Rogers just said, you need to know that you have the right to appeal the sentence that I have imposed on you if you believe for some reason the sentence is illegal or improper. You do have that right. Okay?

All right. We have another sentencing. I'd like to take that up immediately, if possible. Are we ready to go on that? Is the defendant outside? All right. I'm going to go up and get that file and be right down.

(Court concluded at 11:40 a.m.)

# CERTIFICATION

I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

Anne M. Clayton

Anne M. Clayton, RPR

July 28, 2005

Date